IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| B.L. | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION FILE NO.: |
| | : | |
| v. | : | |
| | : | _____ |
| A2C BUDGET HOTEL, LLC; AND | : | |
| STABLEGOLD HOSPITALITY, | : | |
| LLC | : | |
| | : | |
| Defendants. | : | |

---

## COMPLAINT

---

Matthew B. Stoddard
Patrick J. Hannon
THE STODDARD FIRM
1534 N Decatur Road
Atlanta, GA 30307
P: 470-467-2200
F: 470-467-1300
matt@legalhelpga.com
pat@legalhelpga.com

**Attorneys for Plaintiff**

## TABLE OF CONTENTS

Introduction.................................................................................................3

Procedural Issues.........................................................................................4

Seventeen-Year-Old B.L. Is Trafficked for Sex...........................................5

Defendants Have Extensive Knowledge of Trafficking at Its Hotel.......................14

    A.    The Industry Knowledge.......................................................14

    B.    The Online Reviews............................................................19

    C.    The Law Enforcement Activity............................................21

    D.    The Traffickers Were Prosecuted………………………...…………21

Defendants Have Knowledge That B.L. Was Being Trafficked............................22

COUNT 1:  TVPRA Civil Beneficiary Claims.......................................................27

COUNT 2:  Premises Liability Claims....................................................................31

COUNT 3:  Nuisance Claims………………....................................................34

Proximate Cause and Damages..............................................................................34

Conclusion and Prayer for Relief...........................................................................36

## INTRODUCTION

1.      From 2014 to the present, the hotel located at 4265 Shirley Drive, Atlanta, Georgia 30336 (the "Hotel") was owned by Defendant Budget Hotel LLC. ("A2C"). At the times relevant to this Complaint, the Hotel did business under the name A2C Budge Hotel. Currently, the Hotel does business under the name Economy Hotel.

2.      Defendant Stablegold Hospitality, LLC ("Stablegold") is a company that managed the Hotel.

3.      Both Defendants are owned (at least in part) by Mohemmadali M. Jamal, a Georgia resident, who owns hotels throughout the Atlanta area and in other parts of the United States.  Each hotel is "owned" by a shell company, such as A2C, and managed by Stablegold.  See, e.g., https://www.stablegoldhospitalityga.com/reservations (showing that the hotel may be booked through the Stablegold Hospitality website).

4.      Upon information and belief, Stablegold primarily managed and operated the Hotel. In the alternative, the two entities combined their property and labor to run the hotel as a joint enterprise, with each entity having rights of mutual control.

5.      For several days during July 2018, B.L. – a 17-year-old girl – was repeatedly trafficked for sex at the Hotel by a man named Roderick Hayes,  a/k/a "Yongn Ambitious" ("Hayes"), and Tiara Holmes a/k/a "Cookie" ("Holmes"), and their associates.

**PROCEDURAL ISSUES**

6.      Given the nature of the case, B.L. is identified in this Complaint by her initials to prevent public disclosure of her name. Plaintiff's counsel has either previously disclosed full names to defense counsel or will immediately upon identification of defense counsel.  When filing this Complaint, Plaintiff's counsel also filed a Motion for Protective Order seeking Court permission for Plaintiff to proceed anonymously.  Upon information and belief, Defendants will consent to Plaintiff proceeding without publicly disclosing her name.

7.      A2C can be served through its registered agent, Northwest Registered Agent Service, Inc., 8735 Dunwoody Place, Suite N, Atlanta, Georgia, 30350.

8.      A2C was properly served with process in this matter.

9.      A2C is subject to the jurisdiction and venue of this Court.

10.      Stablegold can be served through its registered agent, Northwest Registered Agent Service, Inc., 8735 Dunwoody Place, Suite N, Atlanta, Georgia, 30350.

11.     Stablegold was properly served with process in this matter.

12.     Stablegold is subject to the jurisdiction and venue of this Court.

13.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (federal question jurisdiction) because this matter concerns the Trafficking Victims Protection Reauthorization Act which is a law of the United States.

14.     Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in Fulton County Georgia which is within the Northern District of Georgia's Atlanta Division. *See* 28 U.S.C. § 1391.

## SEVENTEEN-YEAR-OLD B.L. IS TRAFFICKED FOR SEX

15.     During the entire period that B.L. was trafficked for sex at the Hotel, she was a minor.

16.     Plaintiff was sex trafficked as a minor at the Hotel on several dates in July 2018, during which time she was an invitee.

17.     During this period, one of Plaintiff's traffickers rented rooms at the Hotel from Defendants.

18.     On or about July 9, 2018, Plaintiff ran away from her grandmother's house in Pearson, Georgia.

19.    Plaintiff had been communicating through messaging applications with Roderick Hayes, an adult man who was serving time in a Georgia prison. Hayes arranged to have someone pick up B.L. and to bring her to the Atlanta area. Hayes had promised B.L. that his friends and he (after his release) would help B.L. and take care of her.

20.    At Hayes's direction, a woman named Shaunda picked B.L. up in Pearson and brought her to a gas station on Fulton Industrial Road, where Shaunda left B.L. with an adult woman named Tiara Holmes.

21.    Holmes had B.L. walk with her to the Hotel.

22.    Upon arrival at the Hotel, Holmes took B.L. to Room 318, where, unbeknownst to B.L., two men were waiting.

23.    The older of the two men rapped B.L., which Holmes knew would happen and was what she had intended. The younger of the two men attempted to anally rape B.L. but was unsuccessful.

24.    Holmes, who was a prostitute working for Hayes, recorded the part of the assaults for Hayes.

25.    Holmes left the room during the assaults but returned later.

26.    When Holmes came back into the room, she learned that B.L. had not secured payment from her assailants. Holmes became angry with B.L. and beat B.L., leaving a visible red mark on B.L.'s cheek.

27.    Holmes then trafficked B.L. for sex with adult men for money out of the Hotel.

28.    Holmes did this in cooperation with Hayes. Although Hayes was in prison, he was able to communicate with people outside of prison through cell phone calls, texts, and messaging applications.

29.    During the period that B.L. at the Hotel, Hayes and Holmes required B.L. to have commercial sex with whomever they chose.

30.    Holmes would pay in cash for one night at a time at the Hotel, booking the next night's stay before check-out time each morning.

31.    Holmes was trafficking Plaintiff in cooperation with, and often directed by Hayes directed from prison.

32.    Defendants collected revenue from rental of the rooms at the Hotel in which B.L. was forced to have sex.

33.    To control B.L. while she was at the Hotel, Holmes and Hayes threatened B.L. with bodily harm, and forced B.L. to take drugs and alcohol.

34.    To further control B.L., Hayes instructed Holmes to beat B.L., which Holmes did, leaving a large red mark on her cheek after the first beating.

35.    While at the Hotel, Holmes contacted her regular clients and arranged for them to have sex with B.L. for money. Holmes forced B.L. to walk the area around the Hotel to find men who would pay money to Holmes to have sex with B.L.

36.    Holmes made B.L. wear tight fitting, very short skirts and shorts (such that they just covered B.L.'s buttocks) when walking the area around the Hotel. Holmes also required that B.L. wear full and heavy face make up.  B.L. would then drive or walk back to the Hotel with the John to have sex have commercial sex in the Hotel room.

37.    B.L. walked the area around the hotel in full view of the managers and employees of the Hotel, who could see that she was underage and obviously was walking the street in search of commercial sex clients.

38.    Further, the Hotel had a video surveillance system that was monitored such that the managers and employees of the Hotel could view B.L. walking to solicit commercial sex customers, and walking back to her room through the Hotel parking lot with the "Johns."

39.    At that time of the trafficking, the area around the Hotel was well known as the area of Fulton County that had the worst prostitution problem and where sex trafficking was rampant.

40.    Holmes and B.L. went to the Hotel lobby each day to re-rent the room, paying for the room in cash with the money earned from the sex trafficking of B.L.

41.    Holmes and B.L. also went into the Hotel lobby on average at least once each day to have a key re-made.

42.    Whenever B.L. went into the lobby, she was wearing the same short, tight-fitting clothing that she wore when walking the area around the Hotel.

43.    On one occasion, when Holmes and B.L. were in the lobby, the front desk operator told them not to continue going in and out of their room all night. But Holmes and B.L. did not change their behavior after this warning, and the Hotel continued to rent to Holmes.

44.    After approximately 3 or 5 days at the Hotel, Holmes left the Hotel and took B.L. to the Knights Inn across the street.

45.    Holmes rented Room 217 at the Knights Inn, and she and B.L. stayed there for two nights.

46.    Holmes continued on multiple occasions forcing B.L. to have sex with men for money while at the Knights Inn.

47.    Holmes beat B.L. again while at the Knights Inn.

48.    After two nights at the Knights Inn, Holmes took B.L. back to the Hotel, where Holmes rented Room 112.

49.    Back at the Hotel, Holmes continued forcing B.L. to have sex with men for money. Holmes set up "dates" with her regular "customers" via cell phone. Holmes also again forced B.L. walk the area to solicit commercial sex customers wearing the same short, tight clothing. B.L. would meet the "Johns" on the street around the Hotel, and then drive or walk back to the Hotel with the John to have sex have commercial sex in Room 112.

50.    While staying at the Hotel, Holmes told housekeeping staff not to come in the room, and would give housekeeping the soiled laundry at the room door and receive clean sheets and towels, always asking for and receiving extra towels and rags.

51.    The Hotel had a purported policy of requiring vehicles parked in the Hotel parking lot to be registered with the Hotel office, but B.L.'s "dates" who had vehicles never registered with the Hotel and the Hotel never took any action against those Johns because they Hotel knew it was being used for sex trafficking and chose to profit from it.

52.    On July 17, 2018, at about midday, B.L. was taken into custody by a Fulton County Police.

53.    The frequency of the trafficking was such that B.L. was raped at the Hotel by approximately 25 to 30 men.

54.    In short, the following happened repeatedly: a buyer came to the Hotel and purchased the "right" to have sex with B.L. from Holmes, then the buyer raped B.L. in Defendants' Hotel rooms.

55.    B.L. was sexually assaulted 25 to 30 times while at the Hotel by various "Johns."

56.    Holmes took sexually explicit photographs of B.L. at Defendants' Hotel, and then used those photographs to bring more buyers to Defendants' Hotel.

57.    For the duration of the stay at the Hotel, Holmes used a portion of the proceeds from the commercial sex acts to book lodging at the Hotel for the next night.

58.    Holmes and Hayes used Defendants' WIFI network to communicate with each other and with B.L., and to arrange for "dates" for B.L.,  and to generally run the trafficking operation. Upon information and belief, Holmes or her associates paid for use of Defendants' WIFI network either through the room rental fees or a separate charge.

59.    While at Defendants' Hotel, more than 25 adult men visited Plaintiff's room to purchase sex with a child.  The adult men arrived in view of the Hotel's lobby and surveillance cameras.  Defendants knew or should have known that the large number of adult male visitors who stayed in Plaintiff's room for an average of only 15-30 minutes was indicative of commercial sex activity, including minor sex trafficking. Defendants negligently failed to respond to the evidence it knew or should have known indicated minor sex trafficking, including its failure to control and monitor the frequency of male visitors to Plaintiff's room.

60.    Defendants had ample opportunity to observe the age and appearance of Plaintiff as she frequently appeared around the Hotel property, including common areas and approaches, wearing little clothing and soliciting adult men.

61.    On information and belief, Holmes had previously rented rooms and trafficked women for sex at Defendants' Hotel.  As such, at least one of Plaintiff's traffickers were familiar to Defendants' employees, agents, and/or representatives at the time she trafficked Plaintiff for sex at the Hotel.

62.    Plaintiff was forced (through coercion, violence, and threats of violence) to have sex with men in exchange for money in rooms at the Hotel that her traffickers and their associates rented from Defendant.

63.    Plaintiff's traffickers took the money from the sex acts and used it to re-rent Hotel rooms from Defendants, and then those traffickers again forced (through coercion, violence, and threats of violence) Plaintiff to have sex with men in exchange for money in the Hotel rooms.

64.    Defendants' staff and agents observed the following numerous well-known and visible signs of a minor sex trafficking victim that B.L. exhibited:

    a.    including her age and inappropriate appearance, physical deterioration/malnourishment, poor hygiene, fatigue, sleep deprivation,  red mark, and other physical injuries

    b.    lack of freedom of movement and constant monitoring by an older person, known to be a prostitute

    c.    no control over or possession of money

    d.    constant and excessive requests for towels and sheets to housekeeping

    e.    prohibition of some staff members to enter the hotel rooms

    g.    rooms rented daily by the same trafficker who would frequently pay with cash, and

    i.      loitering, soliciting male patrons, and heavy foot traffic outside

her hotel room with a constant stream of male visitors entering

the room one at a time, staying a short period, and then leaving.

**DEFENDANTS HAD EXTENSIVE
KNOWLEDGE OF TRAFFICKING AT ITS HOTEL**

### A.    The Industry Knowledge

65.    Defendants knew or should have known of the existence of sex

trafficking and its illegality since the passage of the Trafficking Victims Protection

Act in 2000, and the United Nations' Palermo Protocol to Prevent, Suppress, and

Punish Trafficking in Persons, Especially Women and Children also in 2000, and

the passage of O.C.G.A. § 16-5-46 in 2007.

66.    Defendants knew or should have known that, in 2013, the acting

Attorney General Sam Olens announced a statewide campaign, "Georgia's Not

Buying It," to combat child sex trafficking. As part of the campaign, AG Olens'

office "collaborated with partners to conduct trainings and increase awareness,"

which included "multiple trainings for the hotel industry."[1]

---

[1] *See* https://law.georgia.gov/press-releases/2013-03-18/attorney-general-olens-law enforcement-announce-campaign-fight-sex (last visited Feb. 11, 2022).

67.     Defendants knew or should have known that the Georgia legislature passed O.C.G.A. § 16-5-47 in 2013, which required hotels to post sex trafficking notices "in each public restroom for the business or establishment and either in a conspicuous place near the public entrance of the business or establishment or in another conspicuous location in clear view of the public and employees where similar notices are customarily posted."

68.     Defendants knew or should have known that the Federal Bureau of Investigations ranked Atlanta one of the worst cities in the country for child sex trafficking.[2]

69.     Defendants knew or should have known that as early as 2001, City of Atlanta officials publicly warned of sex trafficking at area hotels and of the relationship between prostitution and sex trafficking. At that time, the Atlanta Journal-Constitution published a groundbreaking series called *Selling Atlanta's Children*, explaining the problem of sex trafficking in the City and that hotels are complicit in sex trafficking trade.[3]

---

[2] Chris Swecker testimony to the Commission on Security and Cooperation in Europe United States Helsinki Commission, Exploiting Americans on American Soil: Domestic Trafficking Exposed, The Federal Bureau of Investigation, (June 7, 2005), available at https://archives.fbi.gov/archives/news/testimony/exploiting-americans-onamerican-soil-domestic-trafficking-exposed (last visited Feb. 11, 2022).

[3] Jane O. Hansen, Selling Atlanta's Children: Runaway Girls Lured into the Sex Trade are being Jailed for Crimes while their Adult Pimps go Free, The Atlanta Journal-Constitution, Jan. 7, 2001;

70.    Defendants knew or should have known that the Atlanta metro-area well-publicized reputation as an "epicenter for human trafficking, and particularly child sex trafficking," and as "the number one city for child sex trafficking." [4]

71.    Defendants knew or should have known that in 2007, the Atlanta metro-area's sex trafficking economy was worth almost $300 million annually with traffickers reporting average *weekly* earnings of roughly $33,000.[5]

72.    Defendants knew or should have known that the organization called End Child Prostitution and Trafficking (ECPAT-USA) launched the Tourism Child Protection Code of Conduct (the "Code") which outlines well-established best practices for the hospitality industry to combat sex trafficking, and identifies six

---

Jane O. Hansen, The Pimps: Prostitution's Middle Man Slides by in Court, The Atlanta Journal-Constitution, Jan. 7, 2001; Jane O. Hansen, Feds, Police Elsewhere Finding Solutions, The Atlanta Journal-Constitution, Jan. 8, 2001 ("Atlanta City Councilman Derrick Boazman said it's also time to crack down on hotels where adult men take children. 'We need to go after these hotel owners who should know what's happening when someone walks in with a 13-year-old girl,' Boazman said."); Jane O. Hansen, When Danger is as Close as a Phone, The Atlanta Journal-Constitution, Jan. 9, 2001; Jane O. Hansen, Police Plan Child Prostitution Unit, The Atlanta Journal-Constitution, April 28, 2001.

[4] Sally Yates, *Remarks at Justice Department Event Marking National Slavery and Human Trafficking Prevention Month*, Jan. 29, 2015, *available at* https://www.justice.gov/opa/speech/acting-deputy-attorney-general-sally-quillian-yates-delivers-remarks-justice-department (last visited Feb. 09, 2022).

[5] Christian Boone, *Study: Atlanta's Sex Trade Highly Profitable*, Atlanta Journal-Constitution, (March 13, 2014) available at https://www.ajc.com/news/crime--law/study-atlanta-sex-trade-highly-profitable/GiuU5vZdoUo5vdUYSaOBNM.

simple steps hotels can take to prevent child sex trafficking, such as:

    a.      establishing corporate policies and procedures against sexual exploitation of children;

    b.      training employees in children's rights, the prevention of sexual exploitation and how to report suspected cases;

    c.      including a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children;

    d.      providing information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases;

    e.      supporting, collaborating, and engaging stakeholders in the prevention of sexual exploitation of children; and

    f.      reporting annually on the company's implementation of Code-related activities.[6]

73.    Defendants knew or should have known that, compared to other types

---

[6] *See* ECPAT-USA, *The Tourism Child-Protection Code of Conduct*, *available at* www.ecpatusa.org/code/ (last visited Feb. 11, 2022).

of businesses,[7] hotels play a critical role in sex trafficking ventures and serve "a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking. Offering privacy and anonymity on the cheap, they have been employed as . . . rendezvous sites where child sex workers meet their clients on threat of violence from their procurers[.]" *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2457 (2015) (Scalia, J., dissenting, joined by Chief Justice Roberts and Justice Thomas).

74.    Defendants knew or should have known that "[t]he hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity… From check-in to check-out there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property… With proper training, a front desk agent or a housekeeper can notice that something is not right and respond."[8]

75.    Defendants knew or should have known that, without a venue, or crime scene, a sex trafficking venture ceases to exist.

---

[7] *Cf. Sun Tr. Banks, Inc. v. Killebrew*, 266 Ga. 109, 111 (1995) (Sears, J., concurring) ("[T]he banking industry itself anticipates that criminal activity will frequently occur at ATMs."); *Killebrew v. Sun Trust Banks*, 221 Ga. App. 679, 680-81 (1996) (physical precedent only) ("it would be difficult to say that a criminal occurrence at an ATM is unforeseeable as a matter of law. Indeed, such a conclusion could be reached only by turning 'foreseeability' into a legal term of art totally divorced from its meaning in everyday usage.")

[8] *See* https://www.ecpatusa.org/hotel-training (last visited Feb. 7, 2022) (emphasis added).

76.    At all relevant times, Defendants knew or should have known that there was a heightened risk that sex trafficking could take place at its facility as compared to taking place at other locations because of: (i) extensive private sector / non-profit publications informing the public that motels were a hotbed of sex trafficking, (ii) extensive federal / state / local government testimony and press quotations informing the public that Atlanta area motels were a particular hotbed of sex trafficking, (iii) a long running expose in the premier Atlanta newspaper (the AJC) that exposed the extent of the sex trafficking problem at Atlanta area motels, and (iv) the general nature of Defendants' business involving renting private rooms cheaply by the day with each room having a bed where trafficking could occur.

## B.    The Online Reviews

77.    Defendants had actual or constructive knowledge of publicly available online Google reviews and online reviews through other platforms reporting widespread prostitution, sex trafficking, and other illicit activities occurring at the Hotel.

78.    A June 2015 Trip Advisor review states:

**This place is prostitute heaven** and not in the good way at all. There are security on site but they let people wonder all over the location….the rooms smell like drugs, **used condoms all over the parking lot.** This place is a hell hole stay far from it!! (emphasis added)

79.    A July 2015 review from TripAdvisor states:

**Drug addicted prostitutes and broke pimps are liberally located in this place**….**Also, I experience 2 nights of gun shots**….Please stay away, because they allow all the urban dwellers to walk freely around this place and endangering your safety.

80.    A September 2015 review from TripAdvisor states:

Someone that was staying there claimed on his first night, he found used condoms and needles behind the TV. On our first night, we walked next door to get something from the gas station, and **a guy pulled up offering $200 to have sex with my friend**….There was another guy outside of the room next to ours on the second day, asking the person there if he can just get a hit of some rock. (emphasis added)

81.    Another TripAdvisor review from September 2015 states:

**A dragqueen knocked on my room door at 2am asking if "I wanna give it a go"** after I slammed the door in her face, a drug dealer came to my room accusing me of oweing him money on some deal and threatening me. **I was scared for dear life. The next morning a prostitute followed me in my room and tried to [have] sex with me.** This place is horrible. (emphasis added)

82.    A September 2016 TripAdvisor review states:

[I]t was **full of undesirable people roaming around the property. Juvenile delinquents, hookers, and junkies just to name a few.** The rooms were substandard and smelled of musk, smoke, and old semen. They were dusty, unclean, and the bedsheets were stained with blood….We even feared for our safety….I can't emphasize how bad this place really is. (emphasis added)

83.    The online reviews provided Defendants with actual or constructive knowledge of sex trafficking, commercial sex, and the foreseeable risk of future sex trafficking ventures at the Hotel.

## C. LAW EFORCEMENT ACTIVITY AT THE HOTEL

84.     Incident reports regarding the Hotel are not readily available based on the ability of Plaintiff's counsel to get police reports from the Fulton County Police Department without a subpoena, but crime grid showing some of the offenses charged on the property shows the following arrests from January 1, 2015 through July 9, 2018, the beginning of the trafficking period:

      a.  10 aggravated assaults or aggravated batteries

      b.  10 robberies, 7 of which were armed robberies

      c.  2 rapes

      d.  1 homicide

      e.  1 sexual exploitation of a child

      f.  Countless charges of criminal trespass, theft, and battery.

85.     The police report, upon information and belief, contain reports of prostitution, sex trafficking, and drug dealing that put Defendants on notice of substantially similar prior and subsequent bad acts at the property.

## D.     THE TRAFFICKERS WERE PROSECUTED

86.     Holmes was convicted of sex trafficking of B.L., including, among other crimes, sexual exploitation of a child, keeping a place of prostitution for a person under 18, and trafficking for sexual servitude.

87.    Holmes was sentenced to prison for those crimes committed against B.L.

88.    Hayes was convicted of sex trafficking B.L. including, among other crimes, sexual exploitation of a child, pimping, and trafficking for sexual servitude.

89.    Holmes was sentenced to prison for those crimes committed against B.L.

**DEFENDANTS HAD KNOWLEDGE B.L. WAS BEING TRAFFICKED**

90.    Defendants directed, operated, supervised, monitored, managed, and/or employed all employees, managers, housekeepers, and other staff at the Hotel at all relevant times, giving Defendants specific and direct knowledge of sex trafficking, including the sex trafficking that victimized B.L., and other crimes at the Hotel during the relevant period.

91.    Over the course of the trafficking, the Hotel staff had ample opportunity to observe the numerous well-known and visible signs of a minor sex trafficking victim that B.L. exhibited, including her age and inappropriate appearance, physical deterioration, poor hygiene, fatigue, sleep deprivation, no control of or possession of money, loitering, soliciting male patrons, and heavy foot traffic outside her hotel room.

92.    This heavy foot traffic outside B.L.'s Hotel room was voluminous and indicative of sex trafficking. A daily parade of men arrived at the Hotel, either by car or by walking through the parking lot with B.L., entered rooms they did not rent, and stayed in the rooms for only 15 to 30 minutes, only to turn right back around to the parking lot and leave. B.L. could be found walking around the Hotel premises, common areas, and approaches – wearing little clothing and talking to different adult men.

93.    B.L.'s victimization followed a pattern that was readily observable and should have been obvious to Hotel employees based on information available to the public at large and to the hotel industry.

94.    In 2016, the Department of Homeland Security ("DHS") issued guidelines on prevention of sex trafficking which identify numerous warning signs indicative of human trafficking at hotels that hotel staff should be vigilant in observing on the hotel premises, such as:

     a.  persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

     b.  persons who lack freedom of movement or are constantly monitored;

     c.  persons who have no control over or possession of money or ID;

     d.  persons who dress inappropriately for their age or have lower quality

clothing compared to others in their party;

e.  requests for room or housekeeping services (additional towels, new linens, etc.), but denial of hotel staff entry into the room;

f.  the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

g.  extended stay with few or no personal possessions in the room;

h.  excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);

i.  the same person reserves multiple rooms;

j.  a room is rented hourly, less than a day, or for an atypical extended stay;

k.  attempts to sell items to or beg from patrons or staff;

l.  cars in the parking lot regularly parked backward, so the license plates are not visible;

m. loitering and solicitation of male patrons;

n.  waiting at a table or bar and picked up by a male (trafficker or customer);

o.  persons asking staff or patrons for food or money; and

p.  persons taking cash or receipts left on tables.[9]

95.     Prior to B.L.'s trafficking, the End Child Prostitution and Trafficking (ECPAT-USA) also published a list of position specific indicators of human trafficking that hotel staff should recognize to combat trafficking, such as: paying for rooms using cash, paying for multi-day stays one day at a time, escorts  various men  into  the  room  and  lingers until  they  leave,  watching  the  door, room is frequented  by  different  men, insists  on  little  or  no  housekeeping, excessive requests  for  towels  and  sheets, wearing the same attire or attire that is revealing or inappropriate for the weather, excess lingerie,  discarded  condoms  and lubricants, use of websites  with  adult  classified  ads and possessing few personal belongings.[10]

96.     During the time B.L. was trafficked at the Hotel, both B.L. and the rooms where B.L. was trafficked exhibited numerous well-known signs of trafficking identified in the DHS guidance and by ECPAT-USA that gave Defendants and its employees constructive or actual knowledge of B.L.'s sex trafficking, including:

---

[9] U.S. Dep't of Homeland Security, *Human Trafficking and the Hospitality Industry*, available at https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited Feb 10, 2022).
[10]     *See*     ECPAT-USA,     *Human     Trafficking     Indicators*,     available     at https://www.ecpatusa.org/s/ECPATUSA_hotelindicatorsheets.pdf (last visited Feb 11, 2022).

a.  B.L. wearing scantily clad clothing when she walked around the premises, common areas, and while escorting various men into the room and lingering until they leave.

b.  B.L. being escorted and monitored by Holmes or her associates in the Hotel, around the premises and common areas.

c.  B.L. staying at the Hotel for approximately five days at a time.

d.  Holmes always paying in cash for Hotel rooms.

e.  Holmes paying one night at a time for approximately five consecutive days and booking the next night's stay before check-out time.

f.  Numerous men would park, stay in the room for approximately 15 to 30 minutes, and then leave.

g.  Holmes and her associates constantly turning away housekeeping from the rooms where B.L. was being trafficked.

h.  Hotel staff warning Holmes and B.L. about the high volume of foot traffic and warning them to stop coming and going so much. When they came and went, B.L. always was dressed (as described above) as a prostitute, and often B.L. returned with an adult man.

97.     Rather than taking reasonable steps to prevent sex trafficking, Defendants – in the quest for profits – created and maintained a business model that attracts, facilitates and encourages the commercial sex market by providing a private and anonymous venue for traffickers and buyers alike.

98.     Defendants were aware of the short-term rentals of it rooms at the Hotel by buyers of commercial sex and the explicit and apparent purpose for which those rooms were rented.

99.     B.L.'s sex trafficking at the Hotel was a foreseeable and preventable result of Defendants failing to implement reasonable, appropriate, and adequate measures to deter sex trafficking at its Hotel and failing to prevent B.L.'s continued victimization by ignoring her obvious, well-known signs and indicators of sex trafficking.

## COUNT 1: TVPRA CLAIMS

100.    Defendants "knowingly benefited" from Plaintiff's trafficking because:

   a.    the traffickers rented rooms at the Hotel;

   b.    the traffickers used the Hotel WIFI network;

   c.    Defendants collected revenue from the room rentals and the use of the WIFI network; and

       d.     the victim was advertised for sex through the WIFI network and forced to have sex in the rooms.

101.   Defendants took part in a common undertaking involving risk or profit with the traffickers because:

       a.     Plaintiff's trafficker would pay in cash for one night at a time, booking the next night's stay before check-out time;

       b.     Defendants directly rented rooms to people it knew or should have known were engaged in sex trafficking including the trafficking of Plaintiff;

       d.     Defendants were directly renting rooms to the same trafficker – Plaintiff's traffickers;

       e.     Defendants had commercial dealings with Plaintiff's traffickers and then continued to rent rooms to Plaintiff's traffickers.

       f.     Defendants had a continuous business relationship with at least one of Plaintiff's traffickers such that Defendants established a pattern of conduct with that trafficker.

       g.     Before Plaintiff arrived at the Hotel for the first night, Plaintiff's trafficker already had rented a room and had prior commercial dealings with Defendants and then reinstated those dealings.

       h.     Defendants associated with Plaintiff's traffickers in an effort to force Plaintiff to serve Defendants' business objectives.

       i.     Defendants owned, operated, and maintained the Hotel in question.

102.   Plaintiff's traffickers' undertaking with Defendants violated the TVPRA with respect to Plaintiff because:

a.   the traffickers recruited Plaintiff to participate in commercial sex acts at Defendants' Hotel by, among other reasons, stating that they would take care of the Plaintiff and then making Plaintiff work as prostitute;

b.   the traffickers harbored Plaintiff at Defendants' Hotel for the purpose of Plaintiff participating in commercial sex acts at the property;

c.   the traffickers transported Plaintiff to Defendants' Hotel for the purpose of Plaintiff participating in commercial sex acts at the Hotel;

d.   The commercial sex acts occurred at Defendants' Hotel in rooms rented by Plaintiff's traffickers;

e.   the traffickers used force, threats of force, fraud, and coercion to cause Plaintiff to participate in commercial sex acts at Defendants' Hotel;

f.   the traffickers threatened Plaintiff with violence and used this tactic to cause Plaintiff to engage in commercial sex acts at Defendants' Hotel;

g.   the traffickers de-frauded Plaintiff by falsely telling Plaintiff that they would take care of Plaintiff, and then forcing Plaintiff to work as prostitute for them at Defendants' Hotel;

h.   the traffickers coerced Plaintiff to participate in commercial sex acts at Defendants' property by threatening Plaintiff with physical harm if Plaintiff did not engage in commercial sex acts at Defendants' Hotel;

i.   the traffickers knowingly, recruited, enticed, harbored, transported, advertised, maintained, and solicited Plaintiff to engage in commercial sex acts in the Hotel rooms that the traffickers rented from Defendant;

j.    Buyers came to Defendants' Hotel, purchased the "right" to have sex with Plaintiff from her traffickers, and then the buyers raped the Plaintiff at Defendants' Hotel;

l.    Holmes was aware that B.L. was not yet eighteen years of age but nevertheless sold her for commercial sex at Defendants' Hotel;

m.    the traffickers utilized Defendants' wireless internet connection to communicate with each other and to arrange for the commercial sex acts; and

n.    Other actions to be proven at trial.

103.   The venture in which Defendants participated affected interstate commerce for numerous reasons including the sale and use of condoms, the purchase and use of cleaning supplies from out of state, the use of interstate highways to transport Plaintiff to the Hotel by their traffickers (and their associates), and other reasons to be proven at trial.

104.   As shown above, Defendants had – at minimum – constructive knowledge that Plaintiff was being trafficked for sex at the property. *See also* Fed. R. Civ. P. 9(b)("knowledge and other conditions of a person's mind may be alleged generally); *Sun Life Assurance Co. of Can. v. Imperial Premium Fin.*, *LLC*, 904 F.3d 1198, 1215 (11th Cir. 2018) (same).

105.   Defendants directed, operated, supervised, monitored, managed, and/or employed all employees, managers, housekeepers, and other staff at its

Hotel at all relevant times, giving Defendants specific and direct knowledge of sex trafficking, including the sex trafficking that victimized Plaintiffs, and other crimes at the Hotel during the relevant period.

## COUNT 2:  PREMISES LIABILITY LAW

106.   Defendants owed a duty to Plaintiff to exercise ordinary care in keeping the premises and approaches of the Hotel safe. *See* O.C.G.A. § 51-3-1.

107.   Defendants' actual and constructive knowledge of criminal activity at the Hotel made the repeated raping of Plaintiff foreseeable to the Defendant.

108.   Defendants knew or should have known of steps to take to prevent the Hotel from being used as a venue for sex trafficking, rape, forced drug use, assault, and other crimes perpetrated on Plaintiff but negligently failed to deter the crimes or warn the Plaintiff.

109.   Defendants were negligent and said negligence proximately caused Plaintiff's injuries in the following ways:

      a.    Negligently violating O.C.G.A. § 51-3-1 by failing to use ordinary care to keep the premises safe;

      b.    Negligently failing to provide appropriate and effective security personnel during Plaintiff's sex trafficking at the Hotel;

      c.    Negligently failing to properly inspect and maintain the

premises;

d.    Negligently failing to properly train and supervise its employees regarding sex trafficking and other sex crimes at the Hotel;

e.    Negligently failing to properly retain, hire, train, and supervise said employees;

f.    Negligently failing to ensure business policies, systems, and security were adequately followed and implemented;

g.    Negligently failing to respond to online reviews and publicly available information;

h.    Negligently failing to prevent loitering, pandering, prostitution and trespassing;

i.    Negligently failing to remove loiterers, panderers, prostitutes, pimps and trespassers;

j.    Negligently failing to inspect, patrol, or appropriately monitor the property;

k.    Negligently failing to provide adequate lighting and employ other available security measures, personnel, and devices, such as controlled access, adequate signage, cameras, patrols, inspections, physical, and other landscaping adjustments, and

other measures available;

l.    Negligently failing to remediate a long history of crime at the Hotel;

m.    Negligently failing to warn invitees of known hazards at the property;

n.    Negligently representing to invitees that the property was safe; and

o.    Other negligent acts that violated Georgia common law to be proved at trial.

110.    Defendants also had a duty NOT to aid in the creation of, and NOT to maintain, a continuous and regularly repeated dangerous criminal condition at the Hotel.

111.    Defendants were aware of the dangerous criminal condition at the Hotel and negligently allowed that condition to continue.

112.    Defendants maintained a dangerous criminal condition at the Hotel.

113.    Defendants' creation of and failure to abate a nuisance caused injury to each Plaintiff.

## COUNT 3: NUISANCE LAW

114.   Defendants also had a duty NOT to aid in the creation of, and NOT to maintain, a continuous and regularly repeated dangerous criminal condition at the hotel.

115.   Defendants were aware of the dangerous criminal condition at the hotel and negligently allowed that condition to continue.

116.   Defendants maintained a dangerous criminal condition at the hotel.

117.   Defendants' creation of and failure to abate a nuisance caused injury to Plaintiff.

## CAUSATION AND DAMAGES

118.   As a direct and proximate result of Defendants' acts and omissions Plaintiff suffered substantial physical, emotional, and psychological harm and other damages.

119.   Defendants are joint and severally liable with Plaintiff's traffickers, and their associates, and any other non-party actors who participated in the trafficking for the indivisible injuries that the venture proximately caused to Plaintiff.

120.    Defendants are liable for Plaintiff's damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages under 18 U.S.C. § 1595(a).

121.    Plaintiff brings each and every claim for damages permissible under the law against Defendants for injuries suffered in the incident at issue, and to recover for all special damages, economic losses, medical expenses, necessary expenses, and all compensatory, special, actual, general, and punitive damages permissible under the law, including, but not limited to:

a.    Personal injuries;

b.    Past, present and future pain and suffering;

c.    Disability;

d.    Disfigurement;

e.    Mental anguish;

f.    Loss of the capacity for the enjoyment of life;

g.    Loss of earning capacity;

h.    Lost wages;

i.    Diminished capacity to labor;

j.    Incidental expenses;

k.    Past, present and future medical expenses;

l.    Permanent injuries;

m.    Attorney's fees;

n.    Punitive damages; and

o.    Consequential damages to be proven at trial.

122.   Punitive damages should be imposed upon the Defendants without limitation or cap for its actions which are explained more fully above.

123.   Defendants are also liable for paying Plaintiff's attorneys fees and litigation expenses pursuant to the TVPRA and O.C.G.A. § 13-6-11 because Defendants have acted in bad faith in the underlying transaction as shown herein.

124.   Each of the forgoing acts and omissions constitute an independent act of negligence on the part of Defendant, and one or more or all of the above stated acts were the proximate causes of the injuries and damages sustained by the Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment against Defendants and for the following:

1)    That process and summons issue requiring each Defendant to appear as provided by law to answer the allegations of the Complaint;

2)    Plaintiff be awarded actual damages in amounts to be shown at trial;

3)    Plaintiff be awarded all general, special, compensatory, economic, and other allowable damages in accordance with the enlightened conscience of an impartial jury from Defendant;

4)    Plaintiff be awarded her attorneys' fees and case expenses as allowed by law;

6)    Punitive damages be imposed upon Defendant;

7)    Plaintiff be provided with a trial by jury; and

8)    Plaintiff have such other relief as this Court deems just and appropriate under the circumstances.

This 30th day of August 2024.

**THE STODDARD FIRM**

*/s/ Matthew B. Stoddard*
Matthew B. Stoddard
Georgia Bar No. 558215
Patrick J. Hannon
Ga. Bar No.: 074321
THE STODDARD FIRM
1534 N Decatur Road
P: 470-467-2200
F: 470-467-1300
matt@LegalHelpGa.com
pat@legalhelpga.com
***Attorneys for Plaintiff***

37